05/22/09

# SUPREME COURT OF LOUISIANA

## No. 08-C-1163 c/w 08-C-1169

### RAY F. RANDO

versus

### ANCO INSULATIONS INC., ET AL.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FIRST CIRCUIT, PARISH OF EAST BATON ROUGE

KNOLL, JUSTICE.[*]

We granted these consolidated writ applications to resolve a conflict among the appellate courts of this state on the issue of whether mesothelioma is a compensable occupational disease under the pre-1975 version of the Louisiana Workers' Compensation Act (the "Act"). Rando v. Anco Insulations, Inc., et al., 08-1163 c/w 08-1169 (La. 9/26/08), 992 So. 2d 972, 973. Specifically, a review of the jurisprudence reveals that tort claimants in the First and Fourth Circuit Courts of Appeal may recover against their employers for mesothelioma under the pre-1975 Act, while tort claimants in the Second and Fifth Circuit Courts of Appeal cannot. After reviewing the record and the applicable law, we find mesothelioma resulting from contact with asbestos is not a covered occupational disease under La. Rev. Stat. § 23:1031.1 (1952). Accordingly, we affirm the judgment of the court of appeal, First Circuit, and find the plaintiff's tort claim against his employer for mesothelioma is not barred by the exclusive remedy provision of the Act. We further find no error in the lower court's interpretation of La. Rev. Stat. § 9:2772, a peremptive provision applicable to actions involving deficiencies in

---

[*] Calogero, C.J., retired, recused. Chief Justice Calogero recused himself after oral argument and he has not participated in the deliberation of this case.

surveying, design, supervision, or construction of immovables or improvements

thereon, its liability findings, and the determination of quantum.

## FACTS AND PROCEDURAL HISTORY

On September 23, 2005, at 59 years of age, Ray Rando ("Rando") was

diagnosed with mesothelioma, a rare cancer caused by exposure to asbestos.[1]  On

November 22, 2005, Rando filed suit against H.E. Wiese, Inc., n/k/a Jacobs

Contractors, Inc. ("JCI"), and Parsons Infrastructure & Technology Group, Inc.

("Parsons"), alleging that his disease was caused by his exposure to asbestos while

working as a pipe fitter during his employment with those companies in the early

1970s.[2]  At trial, Rando presented evidence of his exposure to asbestos while

working for JCI in late 1970 and early 1971, and Parsons from April 1972 to

December 1972;  although both exposures were at the Shell Oil facility in Norco,

these exposures were at two separate sections of the plant.  In both employments

Rando alleged onlooker exposure to asbestos used by insulators who were not

employees of JCI and Parsons. As a result of this Court's holding in <u>Austin v.</u>

---

[1]  The National Cancer Institute defines mesothelioma (cancer of the mesothelium) as a disease in which cells of the mesothelium become abnormal and divide without control or order. They can invade and damage nearby tissues and organs. Cancer cells can also metastasize (spread) from their original site to other parts of the body. Most cases of mesothelioma begin in the pleura or peritoneum. Although reported incidence rates have increased in the past 20 years, mesothelioma is still a relatively rare cancer. About 2,000 new cases of mesothelioma are diagnosed in the United States each year. Working with asbestos is the major risk factor for mesothelioma. Most cases of mesothelioma begin in the pleura, the membrane that surrounds the lungs and lines the wall of the chest cavity.

[2]  Rando also filed suit against various other entities, including former employers, various premises owners where he was allegedly exposed to asbestos, insurers, as well as numerous companies that designed, manufactured, sold, and installed asbestos-containing products.  He released and/or settled with all these entities, leaving JCI and Parsons as the only remaining defendants at trial.

<u>Abney Mills, Inc.</u>, 01-1598 (La. 9/4/02), 824 So. 2d 1137,[3] the trial court applied

the 1952 version of La. Rev. Stat. § 23:1031.1, the law effective on the date of

Rando's "significant exposure" to asbestos.  La. Rev. Stat. § 23:1031.1 (1952)

provided in pertinent part as follows:

> Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the Compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.

> (A) An occupational disease shall include *only those diseases hereinafter listed* when contracted by an employee in the course of his employment as a result of the nature of the work performed . . .

>> 1. Poisoning by or other disease resulting from contact with:

>> (a) the halogens, halogen compounds, and halogenated hydrocarbons
>> (b) alkaline materials
>> (c) arsenic, phosphorus, xilenium, sulfur, tellurium, and their compounds
>> (d) oxygen, nitrogen, carbon, and their compounds
>> (e) cyanides and cyanogen compounds
>> (f) lead and lead compounds
>> (g) metals other than lead and their compounds
>> (h) aliphatic hydrocarbons and their nitro, diazo and amino compounds
>> (i) aromatic and cyclic hydrocarbons and their nitro, amino and other compounds
>> . . .

>> 2.  Diseased condition caused by exposure to X-rays or radioactive substances

---

[3] In <u>Austin v. Abney Mills</u>, this Court held that a cause of action for tort liability in long-latency occupational disease cases accrues upon significant tortious exposure to the disease causing agent which later results in the manifestation of damages. 824 So. 2d at 1154. There appears to be no dispute that the significant exposures in this case occurred between 1952 and 1975, thus the 1952 version of La. Rev. Stat. § 23:1031.1 applies to this case under <u>Austin</u>.

3. Asbestosis[4]
4. Silicosis
5. Dermatosis
6. Pneumoconiosis

(Emphasis added).

Subsection F of the 1952 statute further provided that "[t]he rights and remedies herein granted to an employee or his dependent on account of an occupational disease for which he is entitled to compensation under this chapter shall be exclusive of all other rights and remedies of such employee . . ." La. Rev. Stat. § 23:1031.1 (1952).

The trial court denied JCI and Parsons' motion for summary judgment in which they asserted that the exclusivity provisions of the Act barred Rando's tort suit.[5] The court of appeal denied Parsons' request for supervisory review,

---

[4] Generally, asbestosis is a respiratory disease involving scarring of lung tissue caused by the inhalation of asbestos particles. James T. McDonough, Jr. (Ed.), Stedman's Concise Medical Dictionary (2d ed. 1994).

[5] The trial court reasoned as follows:

> Mesothelioma is not included as a covered disease in the 1952 compensation act. Asbestos is not included as a substance that causes disease in the act. Rando is therefore, free to sue his employers in tort.

In its 2002 Austin decision the Louisiana Supreme Court ruled:

> Where the act provides no coverage for an occupational disease, the employee enjoys no compensating advantage for the surrender of any tort rights he may have; therefore, he is free to proceed against his employer in tort . . . The Fourth Circuit recently upheld the principle when it held that, because the pre-1975 version of La. Rev. Stat. 23:1031.1 did not include mesothelioma as a covered disease or asbestos as a substance that caused disease, the plaintiffs were not precluded from pursuing a negligence action against their

4

observing that Parsons could address the issue on appeal after trial on the merits. Rando v. Anco Insulations, Inc., 07-0020 (La. App. 1 Cir. 1/8/07) (unpublished). After a bench trial, the trial court determined Rando's cause of action accrued prior to 1975 while working for JCI and Parsons, and that these defendants should have known about the dangers of asbestos materials at that time. The trial court also cited Austin, supra, as conclusively holding that because "the pre-1975 version of La. Rev. Sta. 23:1301.1 did not include mesothelioma as a covered disease or asbestos as a substance that caused disease, the plaintiffs were not precluded from pursuing a negligence action against their employer." The court awarded general damages to Rando for pain and suffering, mental anguish, and loss of enjoyment of life in the amount of $2.8 million along with special damages in the amount of $402,000. The court determined there was evidence that eight entities were joint tortfeasors, and applied the pre-1980 "virile share" law under which fault is divided among joint tortfeasors into virile or equal shares regardless of whether one played a greater role in causing damages. Judgment was then entered against JCI for one-eighth of the total amount of the award, or $400,250.00, and against Parsons for the same amount.

JCI and Parsons appealed, arguing they were entitled to tort immunity under the 1952 version of La. Rev. Stat. § 23:1031.1 and that, if not, the trial court erred in finding Rando's exposure to asbestos while employed by them caused mesothelioma, and in finding they should have known Rando was at risk for developing mesothelioma while in their employ. Further, JCI argued Rando's claims were barred by La. Rev. Stat. § 9:2772, which, at the time he worked for JCI, provided a peremptive period of 10 years for actions involving deficiencies in

employer.

design, supervision or constructions of improvements to immovables, with an exception precluding a person in possession or control, as owner, lessor, tenant, or "otherwise" of such an improvement, from asserting the defense if the deficiency constituted a proximate cause of the injury.   La. Rev. Stat. § 9:2772 (1964).

The court of appeal affirmed the trial court's judgment based on that circuit's prior decision in Terrance v. Dow Chemical Co., 06-2234 (La. App. 1 Cir. 9/14/07), 971 So. 2d 1058, writ denied, 07-2042 (La. 12/14/07), 970 So. 2d 534, which held that the 1952 version of La. Rev. Stat. § 23:1031.1 did not include mesothelioma as a covered disease or asbestos as a covered substance that caused a disease, and thus an employee suffering from mesothelioma is not precluded from filing a tort action against an employer for damages.  Rando v. Anco Insulations, Inc., et al., 07-2093 (La. App. 1 Cir. 5/2/08) (unpublished).  The court of appeal also found that Rando's claims were not perempted under La. Rev. Stat. § 9:2772 because JCI had ultimate control over the construction project at the time of plaintiff's exposure.  Id. at p. 2.  Finally, the court of appeal found no manifest error in the trial court's factual findings on causation and knowledge.  Id. at p. 8.

## STATUTORY INTERPRETATION

There exists a split among the circuit courts of appeal on the issue of whether mesothelioma was a compensable occupational disease under the pre-1975 version of the Act and thus subject to the exclusivity provision of the pre-1975 version of La. Rev. Stat. § 23:1031.1.  Our review of the jurisprudence shows the Second and Fifth Circuit Courts of Appeal have held that mesothelioma is a compensable occupational disease under the Act and those plaintiffs are barred from asserting tort claims because of the exclusivity provision of the pre-1975 version of the Act.  See Adams v. Asbestos Corp., 39,952 (La. App. 2 Cir.

10/28/05), 914 So. 2d 1177; <u>Brunet v. Avondale Indus., Inc.</u>, 99-1354 (La. App. 5 Cir. 12/5/00), 772 So. 2d 974, <u>writ</u> <u>not</u> <u>considered</u>, 01-0171 (La. 3/23/01), 787 So. 2d 1006. The First and Fourth Circuit Courts of Appeal have held just the opposite – mesothelioma is not a compensable occupational disease under the pre-1975 version of the Act and thus these workers may pursue tort claims against their employers. <u>See</u> <u>Terrance v. Dow Chemical Co.</u>, 06-2234 (La. App. 1 Cir. 9/14/07), 971 So. 2d 1058, <u>writ</u> <u>denied</u>, 07-2042 (La. 12/14/07), 970 So. 2d 534; <u>Gauthreaux v. Rheem Mfg. Co.</u>, 96-2193 (La. App. 4 Cir. 12/27/96), 690 So. 2d 39, <u>writ</u> <u>denied</u>, 97-0222 (La. 3/14/97), 694 So. 2d 977. Our task is to resolve that conflict.

JCI and Jacobs contend that pre-1975 La. Rev. Stat. § 23:1031.1 provided, in pertinent part, that an employee could seek workers' compensation if he suffered from an "occupational disease" including a disease resulting from "contact with" certain listed substances or compounds. Included in the listed substance and compounds was "[p]oisoning by or other disease resulting from contact with: . . . (d) oxygen, nitrogen, carbon, and their compounds . . . [and] (g) metals other than lead and their compounds." They argue, in conformity with the holdings of the Second and Fifth Circuit Courts of Appeal, that asbestos is a compound of oxygen and metal. Thus, they assert mesothelioma, a disease caused by asbestos, is a compensable occupational disease under the pre-1975 Act.

Rando argues the Court of Appeal, First Circuit, properly rejected the defendants' affirmative defense of tort immunity. He contends the pre-1975 version of the Act was designed to provide compensation only for *specific* diseases and that neither asbestos nor mesothelioma are included in the provisions of La. Rev. Stat. § 23:1031.1. According to Rando, the expansive reading of the

statute urged by Parsons and JCI violates principles of statutory interpretation, including the principle that the Act should be liberally construed in favor of the injured employee when he seeks coverage under the Act, but narrowly interpreted when construing the exclusivity provision of La. Rev. Stat. § 23:1031(F). He further claims that JCI and Jacobs's reading of the pre-1975 version of the Act renders parts of the statute redundant and superfluous.

The starting point for interpretation of any statute is the language of the statute itself. Touchard v. Williams, 617 So. 2d 885 (La. 1993). When a law is clear and unambiguous and its application does not lead to absurd consequences, the law is applied as written, and no further interpretation may be made in search of legislative intent. La. Civ. Code art. 9. However, when the language of a law is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. La. Civ. Code art. 10. Elaborating upon this latter principle, we stated in Fruge v. Muffoletto, 137 So. 2d 336 (La. 1962):

> In construing a statute, the primary object is to ascertain and, if possible, give effect to the intention and purpose of the legislature as expressed in the statute. Since the meaning is to be determined from a general consideration of the act as a whole, all parts, provisions or sections must be read together; each must be considered with respect to, or in the light of, all the other provisions, and construed in harmony with the whole. The intent as deduced from the whole will prevail over that of a particular part considered separately. Meaning should be given, if possible, to each and every section, and the construction placed on one portion should not be such as to obliterate another; so, in determining the meaning of a word, phrase or clause, the entire statute is to be considered.

Fruge, 137 So. 2d at 339; see also O'Regan v. Preferred Enterprises, Inc., 98-1602 (La. 3/17/00), 758 So. 2d 124. Finally, the words of a law must be given their generally prevailing meaning and words of art and technical terms must be given

their technical meaning when the law involves a technical matter.  La. Civ. Code art. 11.

It is also well settled that when courts interpret provisions of the Workers' Compensation Act, the basic history and policy of the compensation movement must be taken into account. Stelly v. Overhead Door Company of Baton Rouge, 94-0569 (La. 12/8/94), 646 So. 2d 905; Roberts v. Sewerage & Water Bd. of New Orleans, 92-2048 (La. 3/21/94), 634 So. 2d 341, 345. Likewise, as both Stelly and Roberts establish, although this Court liberally construes the coverage provisions of the workers' compensation act, it narrowly construes the act's immunity provisions. Stelly, 646 So. 2d at 910; Roberts, 634 So. 2d at 346.

The history of the workers' compensation begins when the state of New York passed the first workers' compensation statute in the United States in 1910. Four years later, following the submission of a lengthy report and recommendation by a Commission Governor L. E. Hall tasked to study and draft laws providing for compensation to injured employees, the Louisiana Legislature enacted one of the first workers' compensation statutes in the South. In its report to the Legislature, the Commission detailed there was "conservatism required" in enacting such a system of laws, because of the diverging approaches by the differing states. Furthermore, it was noted  the concept of workers' compensation in Louisiana was "all in the experimental state." La. Sen. Journal Reg. Sess. 1914, p. 33.  The Commission found  conservatism was required because "no matter how moderate the act may be in its provisions, it is a radical departure, being suddenly adopted through the United States, from the line of thought which prevailed up to 1910." Id.; see also 13 Malone and Johnson, Louisiana Civil Law Treatise  § 36 (4th ed. 2002) (noting that although it was impressed with the diversity of treatment

accorded the various workers' compensation problems in the various states commented, "it was aware of the novelty of the entire compensation principle and the possibilities of failure that attended many of the more experimental measures."). Against that backdrop, La. Rev. Stat. § 23:1031 (1914) originally provided an employee who "receives personal injury by accident arising out of and in the course of [his] employment" is to receive compensation.

An early decision from this Court described this first workers' compensation act as follows:

> The act, which is social legislation, was passed for the joint benefit of labor and management in order to insure that employees who became disabled as a result of their labors in hazardous industries would have, during the period of their disability, a weekly income for the upkeep of themselves and their families. . . . In order that this end might be accomplished, the Legislature provided for sacrifices to be made by both the employer and the employee. The employee was required to waive the right granted him under the general law, Article 2315 of the Civil Code, in consideration of receiving a fixed percentage of his wages during the period of disability. The employer on the other hand, was deprived of the defenses afforded to him by the general law and he was assured that, in case any of his employees were injured, they would be entitled to no more than the amount stipulated in the statute as compensation during the period of disability. . . .

Atchison v. May, 10 So. 2d 785, 788 (1942).

However, while described as a compromise in which employers gave up their right to tort damages, in reality, workers injured before 1914 had an exceedingly difficult time recovering in tort. As explained in Roberts:

> The dominant purpose of the movement to adopt compensation laws in the early decades of this century was not to abrogate existing tort remedies that afforded protection to workers. Rather, it was to provide social insurance to compensate victims of industrial accidents because it was widely believed that the limited rights of recovery available under the general tort law was inadequate to protect them. Boggs v. Blue Diamond Coal Co., 590 F.2d 655 (6th Cir. 1979). The so-called "unholy trinity" of judicially-created employer defenses

> (assumption of the risk, contributory negligence and the fellow
> servant rule) were developed and strictly enforced as legal rules in the
> last half of the nineteenth century. The result was recovery in less
> than a quarter of work-related accidents, as injured workers
> subsidized economic growth. Boggs, 590 F.2d at 658-59, citing
> Prosser & Wade, Cases and Material on Torts 619 (5th Ed. 1971);
> Prosser, Handbook of the Law of Torts § 80 (1971). *See also* Larson,
> The Nature and Origins of Workmen's Compensation, 37 Cornell
> L.Q. 206 (1952); Horowitz, The Transformation of American Law
> 251-66 (1977); Pound, The Spirit of the Common Law 29-31 (1921).
> Workers' compensation laws were adopted as a compromise between
> contending forces–labor, which generally favored reform, and
> employers, who generally opposed it. Workers were willing to
> exchange a set of common-law remedies of dubious value for modest
> workers' compensation benefits designed to keep the injured workers
> and their families from destitution. Boggs, 590 F.2d at 659.

Roberts, 634 So. 2d at 345.

In 1918, the Legislature amended La. Rev. Stat. § 23:1021 to define the

terms accident and personal injury as follows:

> (1) "Accident" means an unexpected or unforeseen event happening
> suddenly or violently, with or without human fault and producing at
> the time objective symptoms of an injury.
>
> . . .
>
> (7) "Injury" and "Personal Injuries" includes only injuries by violence
> to the physical structure of the body and such disease or infections as
> naturally result therefrom. These terms shall in no case be construed
> to include any other form of disease or derangement, howsoever
> caused or contracted.

While the purpose of the 1914 statute may have initially been to cover only work-

related "accidents," with the advancement of the industrial revolution and growing

number and types of diseases arising from work-related activities, a liberal

interpretation was given to the statute which "effectuated its beneficent purpose of

relieving workmen of the economic burden of work-connected injuries by

diffusing the costs in channels of commerce." Parks v. Insurance Co. of North

America, 340 So. 2d 276, 281 (La. 1976). Accordingly, this Court recognized

judicial interpretation of that statute often resulted in occupational illnesses and diseases being classified as "accidents" under the Act. Id.[6]

However, it was not until 1952 that the Legislature established express statutory authority for the coverage of occupational diseases under Louisiana's workers' compensation law. 1952 La. Acts No. 532. While other states enacted

---

[6] As the late Justice Marcus explained in Parks:

> Louisiana is among the many jurisdictions that look to the employee to determine whether there was an unexpected and catastrophic effect upon him in deciding that an injury is accidental. Ferguson v. HDE, Inc., 270 So. 2d 867 (La.1972). We have held that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. Ferguson v. HDE, Inc., 270 So. 2d 867 (La.1972); Bertrand v. Coal Operators Casualty Co., 253 La. 1115, 221 So.2d 816 (1968). More particularly, we have recognized that the fact that a condition may commonly be referred to as an illness or disease does not thereby preclude its classification as an accident. Jennings v. Louisiana Southern Life Insurance Co., 290 So.2d 811 (La.1974). In Jennings, we noted that among other conditions frequently termed as diseases, heart disease, stroke, heat stroke, herpes zoster (shingles), cancer and 'bends' have all been treated as compensable accidents within the contemplation of the Workmen's Compensation Act. We are satisfied, therefore, that the acute illness suffered by plaintiff in the instant case constitutes an 'accident' as that term is defined in the compensation act and interpreted in our jurisprudence. The medical testimony is clear that during her episode of acute bronchitis plaintiff suffered an injury, i.e., "violence to the physical structure of her body." The injury was accidental because it was unexpected and unforeseen and occurred suddenly producing at the time objective symptoms. We are confirmed in our conclusions by the well-reasoned opinions in Geist v. Martin Decker Corp., 313 So.2d 1 (La. App.1st Cir. 1975) and Gotte v. Cities Service Oil Co., 298 So.2d 920 (La. App.3d Cir. 1974) wherein hepatitis and pneumonia were both held to be within the statutory definition of accident when the contraction of these conditions was causally related to plaintiffs' employment.

We note our research shows mesothelioma has never been classified as an accidental injury under the statute.

compensation statutes providing blanket coverage for all occupational diseases, the Louisiana Legislature chose a schedule approach, providing compensation for "contraction of an occupational disease," as defined, as the exclusive remedy of the employee or his dependent. The statute explicitly provided coverage for two categories of "occupational disease." One category included specifically listed diseases, namely diseased conditions caused by exposure to X rays or radioactive substances, asbestosis, silicosis, dermatosis, and pneumoconiosis. The other category identified diseases by causative agents and consisted of, relevant to this case:

> Poisoning by or other disease resulting from contact with:
>
> . . .
>
> (d) oxygen, nitrogen, carbon, and their compounds
>
> . . .
>
> (g) metals other than lead and their compounds
>
> . . .

La. Rev. Stat.§ 23:1031.1 (1952); see pp. 3 - 4, supra.

As Wex Malone, a noted scholar on workers' compensation, stated with regard to the Louisiana Legislature's 1952 inclusion of coverage for certain listed occupation disease, "It is noteworthy that our legislature decided to adopt the schedule approach, which limits compensation to specific diseases, at a time when this approach is being abandoned in many other states in favor of a general coverage which includes all diseases of a character related to the nature of the employment." Wex Malone, Louisiana Workmen's Compensation Law and Practice, § 218, p. 26 (Supp. 1955); (Emphasis added).

Although almost every Louisiana legislative session until 1975 amended the Act one way or another (mostly to change the amount of compensation or the various listed disabilities, including the addition of tuberculosis in 1958 or to make minor adjustments dictated by experience in the work place), the amendments did not alter the conservative nature of the Act until the major amendments of 1975. As it became apparent that a considerable number of employment-related diseases did not comfortably fit into the categories set forth in the 1952 amendment,[7] in 1975, the Legislature revised La. Rev. Stat. § 23:1031.1(A) to amend the definition of occupational disease by removing the list of specific diseases for which there was coverage under workers' compensation and substituting the following: "[a]n occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and

---

[7] Alston Johnson notes the following as examples of cases of occupational disease that did not fit into the scheduled listing of the 1952 amendment:

> Bryant v. Magnolia Garment Co., Inc., 307 So. 2d 395 (La. App. 2 Cir. 1975) (pneumoconiosis, but failure to discharge burden of proof; apparently no effort to treat as injury by accident); Gaspard v. Petroservice, Inc., 266 So. 2d 453 (La. App. 3 Cir. 1972) (sympathetic dystrophy suffered by operator of rapidly-vibrating screening machine; not covered by schedule occupational disease coverage, and not accident; no compensation); Homer v. Mississippi River Grain Elevator, Inc., 264 So. 2d 246 (La. App. 4 Cir. 1972) (pneumoconiosis alleged by worker who encountered soy bean dust; court concluded that condition was actually irritation of bronchial asthma; no mention of injury by accident rationale); Hicks v. Liberty Mut. Ins. Co., 165 So. 2d 51 (La. App. 2 Cir. 1964) (emphysema or bronchitis of worker exposed to flour dust; not covered disease; no compensation). . . .

H. Alston Johnson III, 13 Louisiana Civil Law Treatise: Workers' Compensation Law and Practice, § 220, p. 473, n. 5.

peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." 1975 La. Acts No. 583.

Reading the 1952 statute in light of the "basic history and policy of the compensation movement," it cannot be denied the 1952 amendment broadened the coverage of compensation beyond the traditional accidental injury embraced in the original legislative enactment. Notwithstanding, although the 1952 amendment included occupational diseases resulting from exposure to hazardous or toxic substances in the workplace, a plain reading of the statute shows that "an occupational disease shall include *only* those diseases hereinafter listed...." (Emphasis added). Utilizing the principle of "clear and unambiguous" statutory construction, it cannot be gainsaid that neither asbestos nor mesothelioma is listed in the 1952 statute. As the expert testimony in the case at hand makes clear, in 1952 mesothelioma was not yet recognized as a disease caused by exposure to asbestos and the scientific/medical community had not firmly established a causal link between mesothelioma and asbestos. Moreover, it was not until 1971 that OSHA synthesized a growing body of scientific and medical evidence and formally recognized mesothelioma as one of the hazards associated with asbestos. It would be anomalous for us to expansively read the legislative text to include asbestos and mesothelioma under historical facts such as these. See Rodriguez v. Louisiana Med. Mut. Ins. Co., 618 So. 2d 390 (La. 1993) (holding that a statute must be applied and interpreted in a manner which is consistent with logic and the presumed fair purpose and intention of the Legislature). Clearly, when the Louisiana Legislature adopted the schedule approach, it evidenced a rejection of the concept of general coverage for occupational diseases and embraced coverage under the Act for only specific poisoning and "disease resulting from contact

15

with" particularized substances and enumerated diseases. Consequently, we find no indication the underlying purpose of La. Rev. Stat. § 23:1301.1 (1952) was the inclusion of asbestos as a disease-causing substance or that mesothelioma was intended to be covered as an occupational disease under that statute.

In that vein, we find it significant the Legislature specifically included asbestosis as a covered occupational disease, because in 1952, asbestosis was widely known to be caused by asbestos; the same cannot be said of mesothelioma. If we were to adopt the reasoning of JCI and Parsons that asbestos is an oxygen compound, La. Rev. Stat. § 23:1031.1(A)(1)(d), or a metal compound, La. Rev. Stat. § 23:1031.1(A)(1)(g),[8] there would have been no need for the Legislature to specify asbestosis in La. Rev. Stat. § 23:1031.1(A)(3) because it would have been subsumed by either or both La. Rev. Stat. § 23:1031.1(A)(1)(d) and La. Rev. Stat. § 23:1031.1(A)(1)(g). Indicative of the contrary, the Legislature specified asbestosis as a covered occupational disease.

Lastly, as noted above, in 1975, when it became apparent numerous employment-related diseases did not fit into categories of occupational diseases enumerated in the 1952 version of the Act, the Louisiana Legislature abandoned the schedule approach to occupational diseases in favor of comprehensive coverage. 1975 La. Acts No. 583. Unquestionably, the 1975 Act's treatment of the definition of occupational disease encompassed far more diseases than the scheduled categories enumerated in the 1952 version. See O'Regan, 758 So. 2d at 130. "[W]here the new article or statute is worded differently from the preceding

---

[8] We note the trial court did not make a factual determination on the hotly contested issue of whether asbestos is a mineral or either an oxygen or metal compound. Because of our disposition of the question now before us, we do not have to resolve this issue and offer no opinion on the resolution of that question. Nonetheless, *only for analytical purposes* in this opinion do we assume that asbestos is an oxygen or metal compound.

law, the legislature is presumed to have intended to change the law." La. Rev. Stat. § 24:177(C). If we were to adopt the interpretation advanced by JCI and Parsons in the present case, there would have been no need for the Legislature to adopt a broader definition of occupational diseases in 1975 if an expansive reading of the 1952 Act were to be accepted. Such was not the case. See, e.g., Johnson, § 220 (detailing the problems associated with fitting "a considerable number of employment-related diseases . . . into the established categories" included in the 1952 Act.).

We recognize Louisiana courts consistently observe that in the interpretation of a statute, they are bound to give effect to all its parts and not construe any sentence, clause, or word as unmeaning and surplusage if a construction can be legitimately found which will afford force to and preserve all the words of the statute. In re Succession of Boyter, 99-0761(La. 1/7/2000),756 So. 2d 1122, 1129. Having recognized that legal tenet, we find that to read the phrase "and their compounds" after the enumerations of oxygen, nitrogen, and carbon, La. Rev. Stat. § 23:1031.1(A)(1)(c), and metals other than lead, La. Rev. Stat. § 23:1031.1(A)(1)(g), to broadly include asbestos would constitute a myopic reading of the statute that would do violence to our duty to examine the context of the words and the text of the Act as a whole. Thus, considering the limiting words of the statute, the adoption in 1952 of a schedule approach to the definition of occupational diseases, the specificity with which asbestosis was listed in the 1952 statute, and the abandonment of the schedule approach to occupational diseases in 1975, we find no foundation for the argument the Legislature intended La. Rev.

Stat. § 23:1031.1(A)(1) to be read  expansively[9] to cover all asbestos-related diseases.

## PEREMPTION

The record shows between 1970 and 1973 JCI was involved in a major construction project at Shell's chemical plant in Norco, Louisiana.  Around 1970, JCI, an engineering and construction company specializing in chemical and refining industry construction, contracted with Shell to construct a fractionation plant at an existing Shell facility.  During 1970, 1971, and 1973 Rando worked for JCI, and it was at these times he was exposed to asbestos.

Agreeing that its construction project on Shell's property was an improvement to immovable property and pointing out that on the face of his petition it was clear Rando's suit was filed more than ten years after JCI's completion of the work, JCI moved for summary judgment in the trial court, urging Rando's claims against it were barred by peremption under La. Rev. Stat. § 9:2772.  Finding no merit to JCI's contention, the trial court denied JCI's motion for summary judgment.  Thereafter, the reviewing court likewise rejected JCI's appellate argument on this issue.

During the time Rando worked for JCI at the Shell facility, La. Rev. Stat. § 9:2772 (1964) provided no action to recover damages could be brought against any person performing or furnishing the design, planning, supervision, inspection or observation of construction or the construction of an improvement to an immovable more than ten years after the date of registry in the mortgage office of

---

[9] Contrary to the limited, schedule approach the Louisiana Legislature embraced in 1952, an expansive reading of just the carbon compound component of  La. Rev. Stat. § 23:1031.1(A)(1)(c) would encompass "nearly ninety percent of the over seven million chemical compounds known to exist in 1990 contain[ing] carbon." Gautreaux v. Rheem Mfg. Co., 96-2193 (La. App. 4 Cir. 12/27/96), 694 So. 2d 977, 979 (citing Donal Voet & Judith G. Voet, Biochemistry 19 (1990)).

acceptance of the work by the owner, or if no such acceptance was recorded, more than ten years after the improvement has been occupied by the owner. La. Rev. Stat. § 9:2772(A) (1964).[10] In the enactment of this statute, the Legislature contemporaneously provided the following exclusion from this peremptory proviso:

> The peremptive period provided by this Section shall not be asserted by way of defense by a person in possession or control, as owner, lessor, tenant, **or otherwise**, of such improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury, damage, or death sued upon with regard to any cause of action arising out of the alleged delict, quasi delict, or obligation of any such person arising out of his possession or control of the property.

La. Rev. Stat. § 9:2772(E); (emphasis added).

JCI now contends the appellate court erred as a matter of law in finding the exception to peremption under La. Rev. Stat. § 9:2772 applied to a construction contractor that had no ownership or similar interest in the property.[11] In particular, JCI claims the peremptive exception provided in La. Rev. Stat. § 9:2772(E) for those who are "owner, lessor, tenant, or otherwise" extends only to those having overall, long-term control of the property and a pervasive, permanent interest in controlling the property. JCI also contends Rando, not it, bore the burden of showing why the peremptive exception contained in La. Rev. Stat. § 9:2772(E) was operative.

---

[10] The Legislature has reduced the peremptive period for actions in connection with construction on immovable property from ten years to seven years. See 1999 Acts 1024, amending La. Rev. Stat. § 9:2772. In addition, there is now a five-year peremptive period for claims against engineers, surveyors, interior designers, and architects. La. Rev. Stat. § 9:5607.

[11] Although Parsons is also a contractor, only JCI raised the affirmative defense of peremption.

To the contrary, Rando argues peremption is an affirmative defense and JCI failed to meet its burden to prove peremption applied.  He further contends the peremptive exception provided in La. Rev. Stat. § 9:2772(E) was operative because the record fully supports the lower court's finding JCI had possession or control "at the time any deficiency in such an improvement constitutes the proximate cause of the injury." Thus, he asserts his claims against JCI were not perempted.

Peremption is a period of time fixed by law for the existence of a right. La. Civ. Code art. 3458. The right is extinguished upon the expiration of the peremptive period.  Id.   When the peremptive period has run, the cause of action itself is extinguished unless timely exercised.  State Through Div. of Admin. v. McInnis Bros. Const., 97-0742 (La.10/21/97), 701 So.2d 937, 939. "Peremption may be pleaded or it may be supplied by a court on its own motion at any time prior to final judgment." La. Civ. Code art. 3460.  "Peremption may not be renounced, interrupted, or suspended." La. Civ. Code art. 3461.

The peremption exception is considered a peremptory exception.  Denham Springs Economic Development Dist. v. All Taxpayers, Property Owners and Citizens of Denham Springs Economic Development Dist., 05-2274 (La.10/17/06), 945 So.2d 665, 680;  La. Code Civ. Proc. art. 927.  Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception.  Carter v. Haygood, 04-0646 (La.1/19/05), 892 So.2d 1261, 1267.  Peremption has been likened to prescription;  namely, it is prescription that is not subject to interruption or suspension.  Flowers, Inc. v. Rausch, 364 So.2d 928, 931 (La.1978); see also La. Civ. Code art. 3461. As such, the following rules governing the burden of proof as to prescription apply to peremption.

If prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. Carter, 892 So. 2d at 1267. If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. Stobart v. State, through DOTD, 617 So. 2d 880, 882 (La. 1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id., 617 So. 2d at 882-83.

There being no dispute that the fractionation unit JCI constructed at the Shell facility was an improvement to immovable property, La. Rev. Stat. § 9:2772(A), and that Rando's tort suit was filed more than ten years after this improvement was completed and occupied, La. Rev. Stat. § 9:2772(A)(1)(2), we find the threshold elements for the applicability of the peremptive statute satisfied. Accordingly, we find the burden shifted to Rando to show the peremptive exception established in La. Rev. Stat. § 9:2772(E) applied. As such, it was incumbent upon Rando to show JCI was "otherwise" "a person in possession or control . . . of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury." After reviewing the record, we find Rando carried his burden of proof on this issue.

Peremptive statutes are strictly construed against peremption and in favor of the claim. Of the possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement should be adopted. Albach v. Kennedy, 00-0636 (La. App. 1 Cir. 8/6/01), 801 So. 2d 476, 482, writ denied, 01-2499 (La. 10/12/01), 799 So. 2d 1138.

Initially, Rando contends the appellate court properly rejected JCI's contention La. Rev. Stat. § 9:2772(E) applied only to those persons who have an ownership or leasehold interest in the immovable, and did not apply to a contractor. We agree.

Looking at the plain text of La. Rev. Stat. § 9:2772(E), it is clear that although the statute specifically names owners, lessors or tenants as a person in possession or control of the improvement to the immovable, it expands that enumeration with the use of the word, otherwise. As the Legislature's chosen language evidences, it did not limit this peremptive exception to owners, lessors or tenants. Thus, contractors were not preclusively excepted.

Rather, we find the determinative aspect of the peremptive exemption is whether JCI was an entity "otherwise" connected to the project " who was "a person in possession or control . . . of such an improvement <u>at the time any deficiency in such an improvement constitutes the proximate cause of the injury</u>." La. Rev. Stat. § 9:2772(E). In the present case, this inquiry first requires us to examine the temporal question of when, in a latent disease case, the incident caused Rando's injury. That question, now resolved by this Court, is Rando's injury occurred at the time of significant exposure to asbestos, not later when his disease (mesothelioma) manifested itself.[12]  <u>Austin v. Abney Mills, Inc.</u>, 01-1598

---

[12] It is this factor that distinguishes JCI's reliance on cases such as <u>Carr v. Mississippi Valley Elec. Co.</u>, 285 So. 2d 301 (La. App. 4 Cir. 1973). In <u>Carr</u>, the plaintiff's tort action against a contractor was barred by peremption because the damages were incurred "more than ten years after their performance was completed." <u>Id.</u>, at 301. It was for similar reasons, that peremption was applicable in <u>Burmaster v. Gravity Drainage Dist. No. 2 of St. Charles Parish</u>, 366 So. 2d 1381 (La. 1978). Like <u>Carr</u>, the alleged incident forming the basis of the tort suit in <u>Burmaster</u> concerned a drowning death that occurred more than ten years after the completion of a project; the incident in question involved a person who drowned when he tripped over a protruding guard rail brace and fell into the water.
Moreover, in <u>Burmaster</u> we recognized reasoning that illuminates our understanding for the inclusion of the peremptive exception. There we stated:

(La. 9/4/02), 824 So. 2d 1137.  As such, Rando has established the initial temporal

element required for application of the peremptive exclusion.  We must now

examine whether Rando established the requisite elements of "possession or

control" on the part of JCI sufficient to invoke the exemption from peremption.

The appellate court determined JCI possessed the requisite "possession or

control" because its project at the Shell facility was a turnkey job.  JCI contends

this premise is faulty because Shell, not JCI, specified the use of the asbestos-

containing insulation material that led to Rando's injury and that Shell retained

ultimate authority over the methods of construction.  Accordingly, JCI urges that

the appellate court erred in its determination of this issue.

Our review of the jurisprudence shows no decision has addressed what is

meant by the words, possession or control, used in La. Rev. Stat. § 9:2772(E).

---

> We consider that there is a valid distinction
> between persons performing or furnishing the design,
> planning, supervision, inspection or observation of
> construction or the construction of an improvement to
> immovable property and a person in possession or
> control, as owner, lessor, tenant or otherwise, of such
> improvement at the time of the incident giving rise to the
> cause of action.  After the date of registry in the
> mortgage office of acceptance of the work by the owner,
> there exists the possibility of neglect, abuse, poor
> maintenance, mishandling, improper modification, or
> unskilled repair of an improvement to immovable
> property by the owner, lessor or tenant.  It is difficult for
> the architect or contractor to guard against such
> occurrences because, after the acceptance by the owner,
> the architect or contractor ordinarily has neither control
> of the improvement nor the right to enter or inspect the
> improvement.  It is thus reasonable for the legislature to
> have concluded that those with access to and control of
> improvements to immovable property (owner, lessor and
> tenant) should not be accorded the protection of the
> pre-emptive period established by La.R.S. 9:2772.

Burmaster, 366 So. 2d at 1385-86; (emphasis added).

Notwithstanding, we find guidance in our understanding of those terms in the jurisprudence that developed under La. Civ. Code art. 2317 and its pronouncement that we are responsible for damage occasioned by things over which we have custody. Equating the term custody to a loose translation of the French word "garde," we stated in Loescher:

> [T]he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. This relationship will ordinarily be associated with ownership, but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others. It will not belong to the agent or the mandatory, the employee or the servant, or to anyone else for whom there is a responsible principal. The owner may transfer the guardianship by transferring the thing to another who will bear such a relationship to the thing as to himself have the care of it. He may also lose the care of this thing, principally by the theft of the thing.

Loescher v. Parr, 324 So. 2d 441, 447 (La. 1974), n. 4, quoting David E. Verlander III, We Are Responsible, 2 Tul. Civ.L. Forum, No. 2 at 64 (1974).

Although La. Rev. Stat. § 9:2772(E) does not use the term custody, the descriptive terms " possession or control" are indicia of one who has custody, i.e., something in one's care (an immovable in the case of La. Rev. Stat. § 9:2772) "to which one bears such a relationship as to have the right of direction and control over them, . . . ." Id. Moreover, as the excerpt from Loescher demonstrates, the one who has possession or control may be the owner, but it may also extend to a broader category to include others. Id. Likewise, courts have recognized possession or control may be held by more than one person who may bear liability simultaneously. See e.g., King v. Louviere, 543 So. 2d 1327 (La. 1989); Ehrman v. Holiday Inns, Inc., 04-0312 (La. App. 4 Cir. 3/29/95), 653 So. 2d 732, 738, writ denied, 95-1051, 1058 (La. 6/16/95), 655 So. 2d 343; Thumfart v. Lombard, 613 So. 2d 286, 289-90 (La. App. 4 Cir.), writ denied sub nom., Montalbano v.

Lombard, 617 So. 2d 1182 (La. 1993).  In determining whether a thing is in one's custody or garde, courts consider (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any kind of benefit the person derives from the thing.  Doughty v. Insured Lloyds Ins. Co., 576 So. 2d 461, 464 (La. 1991).  Determining who has the custody or garde of the thing is a fact-driven determination.  Id.

With the "possession or control" elements of La. Rev. Stat. § 9:2772(E) as a guide and applying the analogous principles of custody or garde drawn from well-established jurisprudence to illuminate our analysis, we now turn to the record evidence to determine if the lower courts manifestly erred in finding JCI was excepted from peremption as provided  in La. Rev. Stat. § 9:2772(E).

JCI's "possession or control" argument is twofold: (1) Shell, not JCI, specified the use of asbestos-containing insulation material that led to Rando's injury, and Shell mandated in its contract specifications that JCI abide by its (Shell's) engineering standards; and (2) the fact JCI's work at the Shell plant was a turnkey project is not determinative of the possession or control element .  Buttressing that argument, JCI points out Rando stated Shell controlled the work he performed at the Shell plant and he further agreed Shell could have mandated that JCI use safety equipment or face contractual sanctions.

From the outset we observe that although the owner of the immovable may provide contract specifications for the work, that factor alone is not determinative of the question of possession or control.  In accord Beck v. Dubach Lumber Co., 131 So. 196 (La. 1930); Stoute v. Mobil Oil Corp., 297 So. 2d 276 (La. App. 3 Cir.), writ denied, 300 So. 2d 839 (La. 1974).

In the present case, Gayle Carnahan, JCI's engineering/purchasing agent at the time of this contract, described the contractual relationship between Shell and JCI. In essence, Shell turned the entire project over to JCI. Succinctly stated, JCI had the responsibility for designing, fabricating, and installing the fractionation unit at Shell's Norco facility. JCI coordinated all of the subcontractors at the work site. As shown in the record, JCI subcontracted the insulation work to B & B Engineering & Supply Company, Inc. Shell's specifications required high temperature insulation, an item which at that time contained asbestos, and delivery of such insulation was made to JCI at the Shell plant. According to Carnahan, JCI knew that asbestos-containing insulation would be utilized in the project. Moreover, JCI hired thousands of workers on a job-by-job basis, provided at least twelve superintendents, and had foremen on site who controlled the work. Finally, Carnahan stated JCI's job superintendent, not Shell, was ultimately responsible for worker safety at the job site.

Based upon these facts, we find no manifest error in the lower courts' determination JCI had the requisite possession and control necessary to find JCI was excepted from peremption as provided in La. Rev. Stat. § 9:2772(E).

## LIABILITY

JCI asserts the evidence is insufficient to support the lower courts' decision it had a legal duty to Rando, and that Rando failed to prove it (JCI) knew or should have known at the time of his employ pipe fitters could contract mesothelioma. Parsons joins JCI's attack on liability, particularly challenging the finding it knew or should have known Rando was being exposed to hazardous levels of asbestos while under its employ in 1972. Parsons also contends Rando offered insufficient evidence to show its work activities were a substantial factor

26

that contributed to his mesothelioma.  Parsons particularly asserts parties not in its

employ and with whom it had no connection created the insulation dust Rando

breathed.

The standard negligence analysis we employ in determining whether to

impose liability under La. Civ. Code art. 2315 is the duty/risk analysis, which

consists of the following four-prong inquiry:  (1) Was the conduct in question a

substantial factor in bringing about the harm to the plaintiff, i.e., was it a

cause-in-fact of the harm which occurred?  (2) Did the defendant(s) owe a duty to

the plaintiff?  (3) Was the duty breached?  (4) Was the risk, and harm caused,

within the scope of protection afforded by the duty breached?  Mathieu v. Imperial

Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 321-22.  Under a duty/risk

analysis, all four inquiries must be affirmatively answered for plaintiff to recover.

As such, in order for liability to attach under a duty/risk analysis, a plaintiff must

prove five separate elements:  (1) the defendant had a duty to conform his or her

conduct to a specific standard of care (the duty element);  (2) the defendant failed

to conform his or her conduct to the appropriate standard (the breach of duty

element);  (3) the defendant's substandard conduct was a cause-in-fact of the

plaintiff's injuries (the cause-in-fact element);  (4) the defendant's substandard

conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope

of protection element);  and, (5) actual damages (the damages element).  Davis v.

Witt, 02-3102 (La. 7/2/03), 851 So.2d 1119, 1127(La. 2003).

**Duty**

JCI points out that as a pipe fitter Rando never handled asbestos while in

JCI's employ. Initially, JCI contends it had no duty to protect Rando from

exposure to asbestos other contractors used when they provided insulation services

27

on the Shell project. JCI argues the issue of duty is a legal one subject to de novo review, not manifest error review as the appellate court framed the question.

A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Whether a duty is owed is a question of law. Lemann v. Essen Lane Daiquiris, Inc., 05-1095 (La. 3/10/06), 923 So. 2d 627, 632-33. Elaborating further, we stated:

> Whether a duty is owed is a question of law. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.

Id.

There is an almost universal duty on the part of the defendant in a negligence action to use reasonable care to avoid injury to another. Boykin v. La. Transit Co., 96-1932 (La. 3/4/98), 707 So. 2d 1225, 1231. More particularly in the realm of employment, La. Rev. Stat. § 23:13 provides, in pertinent part:

> Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees.

Although acknowledging this enunciated duty of the employer, JCI contends Rando failed to prove the accepted and approved practice in the industry in 1970 - 71. In conjunction with that argument, JCI asserts there was no proof that it should have known during that time period that pipe fitters in the same area, who did not work directly with asbestos, were exposed to unsafe levels of asbestos by other trade workers and were at risk of developing mesothelioma. Thus, JCI

contends the lower courts erroneously expanded the scope of its duty to include obligations that did not exist or apply to it at the time of Rando's alleged asbestos exposure.

JCI contends Rando cannot rely upon OSHA's asbestos regulations, the Walsh-Healy Act or the recommendations of the American Conference of Government Industries Hygenists ("ACGIH") to establish the duty element necessary for his negligence claim.  It contends OSHA's regulations on asbestos were not effective until after Rando's alleged asbestos exposure, that the Walsh-Healy Act was only applicable to federal contractors, and the ACGIH was only advisory.

Although novel issues pervade asbestos litigation, see e.g., Zimko v. American Cyanamid, 03-0658 (La. App. 4 Cir. 6/8/05), 905 So. 2d 465, 925 So. 2d 538, JCI frames the duty issue too narrowly.  Arguendo, recognizing the accuracy of JCI's characterizations of OSHA, the Walsh-Healy Act, and the ACGIH report, for purposes of analyzing the existence of a duty, these documents and enactments evidence a level of knowledge that pervaded the industry and exhibited a growing understanding and awareness of a serious problem regarding asbestos.  Whether JCI had a duty to protect Rando from exposure to asbestos depends on whether JCI knew or should have known of the dangers of asbestos exposure at the time of Rando's employment.  As evidence of the duty incumbent upon a Louisiana employer, even prior to the enactment of OSHA, was the Legislature's inclusion of asbestosis as an occupational disease in 1952.  Although asbestosis may not be equated with mesothelioma, it and mesothelioma share a causative agent, asbestos. For these reasons, we find no legal error in the lower courts' conclusion Rando established a duty on the part of JCI.

*Overview: Cause-in-fact and Legal Cause*

We now turn to the issues of cause-in-fact and legal cause. As well established in the jurisprudence, the cause-in-fact issue is a question of fact. Ambrose v. New Orleans Police Dep't Ambulance Service, 93-3099 (La. 7/5/94), 639 So. 2d 216, 221 (holding that cause-in-fact is a question of fact); Peterson v. Gibraltar Sav. & Loan, 98-1601 (La.5/18/99), 733 So.2d 1198.

In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n, 2002-2660 (La.6/27/03),851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous. Id.

One of the basic tenets of the manifest error standard of review is that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently." Parish Nat. Bank v. Ott, 02-1562 (La.2/25/03), 841 So.2d 749, 753. This principle is further explained in Parish Nat. Bank as follows:

> This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not

reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.

Parish Nat. Bank, 841 So. 2d at 753.

Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1313. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Syrie v. Schilhab, 96-1027 (La. 5/20/97), 693 So.2d 1173, 1176; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).

"Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." Roberts v. Benoit, 605 So. 2d 1032, 1044 (La. 1991). "The scope of protection inquiry asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" Faucheaux v. Terrebonne Consol. Gov't, 615 So. 2d 289, 293 (La. 1993). Although we have unequivocally stated "the determination of legal cause involves a purely legal question, Todd v. State, Dept. of Social Services, 96-3090 (La. 9/9/97), 699 So. 2d 35, 39, this legal determination depends on factual determinations of foreseeability and ease of association. See Perkins v. Entergy Corp., 98-2081 (La. App. 1 Cir. 12/28/99), 756 So. 2d 388, 410, affirmed, 00-1372 (La. 3/23/01), 782 So. 2d 606.

*Cause-in-fact*

Because of the lengthy latency period between exposure to asbestos and manifestation of the disease, cause-in-fact has been noted as the "premier hurdle"

31

plaintiffs face in asbestos litigation. <u>Torrejon v. Mobil Oil Co.</u>, 03-1426 (La. App.

4 Cir. 6/2/04), 876 So. 2d 877, 890-91. To prevail in an asbestos case a plaintiff

must show, by a preponderance of the evidence, he was exposed to asbestos and

he received an injury substantially caused by that exposure. When multiple causes

of injury are present, a defendant's conduct is a cause-in-fact if it is a substantial

factor generating plaintiff's harm. <u>Quick v. Murphy Oil Co.</u>, 93-2267 (La. App.

4th Cir.9/20/94), 643 So.2d 1291, <u>writ</u> <u>denied</u>, 94-2583 (La. 1/6/95), 648 So. 2d

923.

There can be more than one cause-in-fact of an accident as long as each

cause bears a proximate relation to the harm that occurs and it is substantial in

nature. A plaintiff seeking to recover under either negligence or strict liability

theories must prove that the negligent act or defect complained of was a

cause-in-fact of the injury. <u>Davis v. State Farm Ins. Co.</u>, 558 So.2d 636 (La. App.

1 Cir.1990).

In <u>Quick</u> the appellate court found that:

> When evaluating liability in an asbestos claim, we apply
> traditional theories of tort liability (for example, negligence and
> products liability) which require proof of causation. See <u>Cole v.
> Celotex Corp.</u>, 599 So.2d 1058 (La.1992); <u>Halphen v.
> Johns-Manville Sales Corp.</u>, 484 So.2d 110 (La.1986); <u>Thompson v.
> Johns-Manville Sales Corp.</u>, 714 F.2d 581 (5th Cir.1983), <u>cert. den.</u>
> 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984). Asbestos
> cases typically involve multiple defendants and courts have analyzed
> the cases under concurrent causation, a doctrine which "proceeds
> from the assumption that more than one defendant substantially
> contributed to the plaintiff's injury." <u>210 E. 86th Street Corp. v.
> Combustion Engineering, Inc.</u>, 821 F.Supp. 125, 150 (S.D.N.Y.1993).

<u>Quick</u>, 643 So.2d at 1294.

In <u>Dixie Drive It Yourself System v. American Beverage Co.</u>, 137 So.2d

298 (La. 1962), we stated that "conduct is a cause-in-fact of harm to another if it

was a substantial factor in bringing about that harm." Id. at 302. Elaborating on that pronouncement of law, we stated negligent conduct is a substantial factor if the harm would not have occurred without the conduct, i.e., but for defendant's conduct, plaintiff would not have sustained injury.  Thereby, we equated the two concepts of substantial factor and necessary antecedent.  Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 373 (1970).

From the outset, Parsons contends Rando produced no testimony the insulation dust he breathed on the job site as an onlooker contained asbestos.  To buttress its argument, Parsons contends Shell's asbestos abatement records bear a notation showing Shell thought the unit where Rando worked was built asbestos-free.

Although Shell may have indicated on its asbestos abatement record to the contrary, other record evidence preponderates asbestos was present in the unit where Rando worked. In addition, Rando himself testified he thought asbestos was being used in the construction project at Shell because there were high temperature lines involved.  As the record shows, it is assumed if the pipe held heat it was insulated. Moreover, the record indicates Dr. Richard Lemen, Rando's expert in the field of industrial hygiene and epidemiology, opined  asbestos was commonly used on high temperature insulation lines at the time of this work, that high temperature pipe covering block insulation contained asbestos, and asbestos cement was used to connect pipes.  Finally, samples of the insulation used in each unit at Shell indicated the presence of asbestos.[13]

---

[13] Even though JCI did not make a similar assertion, other records admitted into evidence showed high temperature asbestos insulation was specified for the work JCI performed at the Shell job site and such material was shipped to JCI for the use of B & B Engineering, an insulation subcontractor, at the Shell site.

Placing the burden of proof on the plaintiff requires him ultimately to persuade the factfinder concerning each element of the defendant's negligence, and if the factfinder is undecided after all the evidence has been presented, the plaintiff loses because of the failure of his evidence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989); Boudreaux v. American Insurance Co., 262 La. 721, 736-38, 264 So.2d 621, 626-27 (1972). The proof may be by direct or circumstantial evidence. Benjamin ex rel. Benjamin v. Housing Authority of New Orleans, 04-1058, p. 5 (La.12/1/04), 893 So.2d 1, 4; Cangelosi, 564 So.2d at 664. A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. Id. Circumstantial evidence, on the other hand, is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Id., 564 So.2d at 664-65. Use of circumstantial evidence and the deductions and inferences arising therefrom is a common process for establishing liability in negligence cases. Id., at 665. However, the inferences drawn from the circumstantial evidence must cover all the necessary elements of negligence, and the plaintiff must still sustain the burden of proving his injuries were more likely than not the result of the defendant's negligence. Id., at 665. If circumstantial evidence is relied upon, that evidence, taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty. Benjamin, 893 So.2d at 5. This does not mean, however, that it must negate all other possible causes. Id.

After reviewing the evidence, we find the documents, expert testimony, and Rando's anecdotal testimony support the trial court's finding on this threshold

issue. Based upon a preponderance of evidence, Rando proved asbestos was used at the Shell job site.

JCI and Parsons next argue that even if asbestos was present at the job site, Rando provided no evidence vis-à-vis air sampling or similar means that would show Rando was exposed to concentrations of asbestos at the Shell plant.

Our review of the record shows Rando depicted his work experiences under JCI and Parsons with particularity. In this regard, we recount the appellate court's detailed depiction of Rando's testimony as it accurately and succinctly reflects his testimony:

> The evidence at trial reflected that Mr. Rando was employed as a pipe fitter . . . . Mr. Rando testified at that time, Parsons was working on constructing a new unit at Shell's chemical plant. He stated that the entire time he performed his job for Parsons, insulators sawed block insulation on scaffolds above the work area to insulate 100-foot vessels, and other workers cut insulation and pipe covering near where he was working. Mr. Rando testified that as a result of the insulation work, the work area was dusty and particles of insulation were visible in the air. Mr. Rando attested that he breathed the dust from the insulation and that the insulation particles literally 'snowed' on him constantly during the work day and during the entire time he worked for Parsons.

> . . . .

> With respects to [JCI], the evidence reflects that Mr. Rando worked. . . as a pipe fitter in 1970, 1971, and 1973 at Shell's chemical facility in Norco. Mr. Rando testified that he worked in the vicinity of insulators every day during his employ with [JCI]. He attested that on these jobs, insulators cut block insulation to be used on vessels at the site and cut insulation for pipes, causing insulation waste to fall onto the ground or onto scaffolds. Mr. Rando stated that he breathed the dust resulting from the insulation waste falling to the ground and that workers cleaning the area never vacuumed the dust, making the work area even more dusty. He stated that the insulation dust was visible, blew around the work area, and that he inhaled this dust throughout the work day.

Even though it was an asbestosis case, <u>Borel v. Fibreboard Paper Products</u>

<u>Corp.</u>, 493 F.2d 1076 (5th Cir. 1973), one of the earlier asbestos cases to discuss

causation, reasoned:

> [I]t is impossible, as a practical matter, to determine with absolute
> certainty which particular exposure to asbestos dust resulted in injury
> to Borel.  It is undisputed, however, that Borel contracted asbestosis
> from inhaling asbestos dust and that he was exposed to the products
> of all the defendants on many occasions.  It was also established that
> the effect of exposure to asbestos dust is cumulative, that is, each
> exposure may result in an additional and separate injury.  We think,
> therefore, that on the basis of strong circumstantial evidence the jury
> could find that each defendant was the cause in fact of some injury to
> Borel.

<u>Borel</u>, 493 F.2d at 1094.

Building upon this early observation, Louisiana courts have employed a

"substantial factor" test to determine whether exposure to a particular asbestos-

containing product was a cause-in-fact of a plaintiff's asbestos-related disease.

<u>Zimko</u>, 905 So. 2d at 484 (<u>collecting</u> cases).  Thus, in an asbestos case, "the

claimant must show . . . he had significant exposure to the product complained of

to the extent that it was a substantial factor in bringing about his injury."

<u>Asbestos v. Bordelon, Inc.</u>, 96-0525 (La. App. 4 Cir.10/21/98), 726 So.2d 926,

948; <u>Vodanovich v. A. P. Green Industries, Inc.</u>, 03-1079 (La. App. 4 Cir. 3/3/04),

869 So. 2d 930, 933.  Mesothelioma can develop after fairly short exposures to

asbestos.  <u>Egan v. Kaiser Alum. & Chem. Corp.</u>, 94-1939 (La. App. 4 Cir.

5/22/96).  Simply because a plaintiff suffered asbestos exposure while working

only a short period for an employer and he had longer exposure working for

others, it cannot be said the relatively short asbestos exposure was not a

substantial factor in causing his mesothelioma.  <u>Id.</u>, 869 So. 2d at 1035.  However,

notwithstanding the difficulty of proof involved, a plaintiff's burden of proof

against multiple defendants in a long-latency case, such as a tort claim for

mesothelioma, is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant's product to the plaintiff's injury. Quick, 643 So.2d at 1294.

Dr. Arnold Brody, an expert cellular biologist, provided the trial court with a scientific description of the role of asbestos in the disease process. Dr. Brody explained that injury on the cellular level commences immediately upon inhalation of asbestos fibers. This inhalation increases the risk of developing cancer shortly after exposure to these asbestos fibers. Moreover, Dr. Brody characterized asbestos-related cancers as dose/response diseases, i.e., the risk of developing cancer increases as more fibers are inhaled and more genetic errors are formed. In conclusion, he stated eventually the accumulation of genetic errors causes mesothelioma.

With that as background, we note the testimony of Dr. Victor Roggli, an expert pathologist, who testified he reviewed Rando's medical records and deposition testimony. Based upon this evidence, Dr. Roggli concluded it was obvious that Rando's occupational exposure to asbestos caused his mesothelioma. He further opined that Rando's work as a pipe fitter for JCI and Parsons, work that required him to be in close proximity to insulators, was a "substantial contributing factor in the development of his mesothelioma.

In addition to this medical and scientific evidence and Rando's depiction of his exposure to asbestos at the JCI and Parsons' work sites, Rando presented the expert testimony of Dr. Lemen who testified about two aspects of this causation issue, namely, Rando's status as an onlooker exposed to asbestos and the environment in which Rando was exposed to asbestos.

Dr. Lemen opined it was possible that an onlooker, i.e., a worker standing next to another worker who is actually handling asbestos-containing materials, could receive a higher dosage of exposure than the worker who handled the asbestos. Citing an article by Dr. E. R. A. Merewether, Dr. Lemen opined it was first warned in 1930 that exposure to asbestos fibers could affect other trades. He further quoted a 1964 article by Dr. Irving J. Selikoff about insulation workers in the building trades, as follows: "Asbestos exposure in industry will not be limited to the particular craft that utilizes the material. The floating fibers do not respect job classifications. Thus, for example, insulation workers undoubtedly share their exposure with their workmates in other trades." Thus, Dr. Lemen opined the risk of asbestos exposure was not limited to those who directly handled the material; rather, when the onlooker breathed asbestos in sufficient quantities, he too could be at risk for developing an asbestos-related disease.

Commenting further on Rando's depiction of the work sites where he was allegedly exposed to asbestos, Dr. Lemen found it significant Rando could see clouds of dust at the work site; on this basis he concluded the asbestos particles would have been concentrated in large amounts. Utilizing OSHA's 1971 promulgation as to asbestos concentrations, findings based upon an accumulation of scientific evidence over a long period, he opined a cloud of dust as Rando described would probably contain asbestos particles concentrated four to five times the initial minimum standard. Moreover, Dr. Lemen commented that the medical community has never determined a "safe level" of asbestos exposure, i.e., an exposure level below which a worker would not be at risk for developing mesothelioma.

Contrary to Dr. Lemen's opinion concerning onlookers, Parsons presented the expert testimony of John Pendergrass, an expert in industrial hygiene. Premised on his disbelief of Rando's statements about his asbestos exposure at the work site and stressing the lack of scientific evidence about the level of Rando's asbestos exposure, Pendergrass opined it was the general understanding of industrial hygienist in the 1970s that onlookers like Rando were not at risk for developing asbestos-related diseases.

Considering the divergent views of these experts and the generalized attack on Rando's credibility which would cast doubt on his recollection, we find no manifest error in the trial court's determination Rando proved by a preponderance of the evidence his exposure to asbestos was significant and this exposure caused his mesothelioma. We now turn our attention to an analysis of the contention of JCI and Parsons Rando failed to establish any breach of their duty was the legal cause of Rando's injury.

### Legal Cause

Building upon the historical development of the scientific community's understanding of the nature and dangers of asbestos and the role of asbestos in the disease process, JCI and Parsons contend the evidence fails to preponderate they knew or should have known Rando was exposed to asbestos when he did not directly handle asbestos materials and his asbestos exposure was as an onlooker in their employ.

A risk may not be within the scope of a duty where the circumstances of the particular injury to the plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty. Todd v. State Through Social Services, 96-3090 (La.9/9/97), 699 So. 2d 35; Hill

<u>v. Lundin & Associates, Inc.</u>, 256 So. 2d 620 (La. 1972).  The extent of protection owed by a defendant to a plaintiff is made on a case-by-case basis to avoid making a defendant an insurer of all persons against all harms.  <u>Todd</u>, 699 So. 2d at 39.

Dr. Lemen testified medical studies conducted as early as 1930 established that asbestos could cause disabling disease or death to individuals who inhaled asbestos fibers.  He stated Dr. Merewether's 1930 report summarized his findings on the effect of asbestos on workers' lungs in the asbestos textile industry.  Based upon that study he concluded asbestos fibers caused asbestosis and he advanced a "hierarchy of controls" for lessening worker exposure to asbestos, including ventilation, segregation of workers, wetting the dust, warning workers about the associated dangers and how to protect themselves, and sweeping or vacuuming the work area to limit introduction of the asbestos fibers into the air.  Dr. Lemen further testified that between 1935 and 1955 studies associated the inhalation of asbestos with the development of lung cancer, and that between 1960 and 1964 mesothelioma was identified as being caused by asbestos.

Although Pendergrass, Parsons' expert industrial hygienist, attempted to limit these earlier studies to persons who directly handled asbestos-containing products,  his testimony nonetheless illuminates the issue now before us in other ways.  He acknowledged the employer bears the responsibility to protect the various workers from asbestos exposure generally utilizing Dr. Merewether's control methodology.  He further could not argue with Selikoff's 1964 report which emphasized that even light intermittent exposure to asbestos posed a risk to bystanders in the construction industry because floating asbestos fibers do not respect job classifications.  In addition, contrary to the assertion of JCI and Parsons that OSHA has no bearing in this matter because it was formally effective

after Rando's exposure, Pendergrass explained the 1971 OSHA requirements relative to asbestos exposure were based on national consensus standards that pre-existed its effective date. As shown above, by 1971 it was known that asbestos was associated with asbestosis, the development of lung cancer, mesothelioma, and that onlookers were also at risk to such exposure.

For the foregoing reasons, we find the record amply supports the lower courts' determination that the legal cause element encompassed Rando within the duty JCI and Parsons owed. Accordingly, we find that the scope of JCI and Parsons' duty extended to Rando, even though he did not directly handle asbestos products during his employment.

## QUANTUM

Parsons contends the trial court's award of $2.8 million for general damages was excessive. Although acknowledging that no two cases are identical, Parsons provides this Court with a series of reported decisions which it asserts are similar. Thus, it contends we should reverse the trial court on this issue and suggests a general damage award in the range of $500,000 to $750,000 is appropriate.[14]

The trial court's determination of the amount of an award of damages is a finding of fact. Ryan v. Zurich American Ins. Co., 07-2312 (La. 7/1/08), 988 So.2d 214. The Civil Code provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La. Civ. Code art. 2324.1. Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that

---

[14] Although Parsons contested the trial court's special damage award of $400,250 in the appellate court, it has not re-urged this argument in this Court.

the fact finder is clearly wrong or manifestly erroneous. On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ryan, 988 So. 2d at 219. Moreover, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's great discretion. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 200 So.2d 1 (La. 1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate for purposes of then determining what would be an appropriate award for the present case.

In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited function if indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) "similar" injuries, see Coco v. Winston Industries, Inc., 341 So.2d 334 (La. 1977). However, absent an initial determination the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979).

Our review of the record shows Rando was 59 years of age at the time he was first diagnosed with mesothelioma in 2005. Before this diagnosis of cancer,

Rando had an unrelated arthritic condition, but otherwise was in good health; he was enjoying retirement and was leading an active life with his family. By the time of trial, Rando was suffering significant pain and other symptoms associated with mesothelioma.   He had undergone five surgeries, multiple medical procedures, and numerous trips to doctors and emergency rooms. He has suffered significant pain not only from the cancer, but also from the chemotherapy and medications, including the side effects of both. As the trial court observed, Rando has suffered from nausea, nerve pain, stabbing back and chest pain, muscle pain, headaches, and vision loss, and these will only worsen in time. Even though Rando will undergo these treatments for the remainder of his life, the medical evidence shows none of these will cure his cancer.

Considering these well documented facts, we find the trial court did not abuse its vast discretion in setting the general damage award in this case.

## DECREE

For the foregoing reasons, the judgment of the Court of Appeal, First Circuit, is affirmed.

**AFFIRMED.**

05/22/09

# SUPREME COURT OF LOUISIANA

### No.  08-C-1163 c/w 08-C-1169

### *RAY F. RANDO*

*versus*

### *ANCO INSULATIONS INC., ET AL.*

## ON WRITS OF CERTIORARI TO THE COURT OF APPEAL, FIRST CIRCUIT, PARISH OF EAST BATON ROUGE

**VICTORY, J., dissenting.**

I dissent from the majority's holding that mesothelioma is not a compensable occupational disease under the pre-1975 version of the Louisiana Workers' Compensation Act (the "Act").

The issue before the Court involves an examination of the 1952 version of La. R.S. 23:1031.1 to determine if asbestos is an oxygen compound or a metal compound under that statute.  The majority recites the correct rules of statutory construction, namely, that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law is applied as written, and no further interpretation may be made in search of legislative intent."  However, it nonetheless, purporting to "utiliz[e] the principle of 'clear and unambiguous' statutory construction," Slip Op. at 15, interprets the statute by searching for the intent of the legislature.  That is prohibited under our statutory rules of construction.  La. C.C.P. art. 9.

The sole issue before the Court is whether, under the clear and unambiguous language of the statute, asbestos is an oxygen or metal compound.  Amazingly, while noting that whether asbestos is an oxygen or metal compound is a "hotly contested issue," the majority determines that it "do[es] not have to resolve this issue and offer

1

no opinion on the resolution of that question." Slip Op. at 16, n. 8. However, the main reason we granted this writ application was to resolve this "hotly contested issue."

In addition to applying the law as written when its application does not lead to absurd consequences, courts must take into account the basic history and policy of the compensation movement when interpreting the Act. *Roberts v. Sewerage & Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So. 2d 341, 345. Since the inception of the Act, one of the strongest and most recognized policies in Louisiana law has been that **the Act is to be interpreted broadly in favor of finding coverage for the injured employee.** *Breaux v. Hoffpauir*, 95-2933 (La. 5/21/96), 674 So. 2d 234 ("In light of the policies behind the Workers' Compensation Act [to keep the injured employee from destitution], this Court has adopted special rules for interpreting its provisions such that to effectuate the remedial policy of the Act, its provisions should be liberally construed in favor of the claimant"); *Roberts*, *supra*; *Hall v. Pipeline Service Corp.*, 98 So. 2d 202 (La. 1957); *Bean v. Higgins, Inc.*, 230 La. 211, 88 So. 2d 30 (1956); *Myers v. Southwest Region Conference Ass'n of Seventh Day Adventists*, 230 La. 310, 88 So. 2d 381 (1956) (language of statute "should be considered in its broadest possible aspect"); *Johnson v. Cabot Carbon Co.*, 227 La. 941, 81 So. 2d 2 (1955); *Caddo Contracting Co. v. Johnson*, 222 La. 796, 64 So. 2d 177 (La. 1953) (all statutory provisions of the Act are to be given a liberal construction); *Dick v. Gravel Logging Co.*, 152 La. 993, 95 So. 99(1922) (the provisions of the Act are to be liberally construed so as to include all services that can reasonably be said to come within them). These coverage provisions, which include the provisions of La. R.S. 23:1031.1, must be interpreted broadly no matter which party is seeking to apply them, whether it be a plaintiff seeking coverage under the

Act, or a defendant arguing that the plaintiff is covered under the Act.

The question is whether, under the statute as written and interpreted broadly, asbestos is an oxygen compound or a metal compound. If the answer to this question is clear and unambiguous and its application does not lead to absurd consequences, we must apply the law as written. Looking at the language of the statute itself, which is the starting point in statutory interpretation, we can see that the language is clear and unambiguous as it provides workers' compensation benefits for certain named diseases, and for diseases relating from contact with, among other things, " oxygen, nitrogen, carbon and their compounds" and "metals other than lead and their compounds." There is simply no ambiguity in those words. As mesothelioma was not a listed disease under the statute, the only issue here is whether asbestos is in fact an oxygen compound or a metal compound and the evidence presented in this case centered around that issue.

In support of their positions on this issue, both sides presented expert testimony in the form of affidavits or otherwise. The defendants presented the affidavit of Harry E. Ensley, Ph.D, an Associate Professor of Chemistry at Tulane University, who testified that all forms of asbestos are oxygen compounds and metal compounds. He defined a "compound" as follows:

> **Compound** – "A substance composed of atoms or ions of two or more elements in chemical combination. The constituents are united by bonds or valence forces. A compound is a homogeneous entity where the elements have definite proportions by weight and are represented by a chemical formula. A compound has characteristic properties quite different from those of its constituent elements." *Hawley's Condensed Chemical Dictionary*, 12th Ed., Richard J. Lewis, Sr., Van Nostrand Reinhold Company, New York, 1993. See Attachment G.
>
> *Webster's II New College Dictionary*, Houghton Mifflin Company, New York, 2001 (Attachment I), and *The American Heritage Dictionary of the English Language*, Houghton Mifflin Company, New York, 1981 (Attachment H), each contain the following definition: "A pure,

macroscopically homogeneous substance consisting of atoms or ions of two or more different elements in definite proportions, and usually with properties unlike those of its constituent elements."

He defined a "mineral" as "an element or chemical compound that is normally crystalline and that has been formed as a result of geological processes," and presented other authoritative evidence conclusively establishing that minerals must always be either chemical elements or chemical compounds, which means it is either one type of atom (an element) or two or more atoms or ions of two or more different elements in definite proportions (a compound).[1]  He described chrysotile, which accounted for 90% of the asbestos mined worldwide, as both a compound and a mineral, with the chemical formula $Mg_3Si_2O_9H_4$, meaning it is a compound composed of four different elements-magnesium, silicon, oxygen, and hydrogen, always in definite proportion.  He further identified each of the other forms of asbestos as belonging to the amphibole group, including amosite, actinolite, crocidolite, and anthophyllite, as being both oxygen and metal compounds.  In this group, certain ions substitute for each other within the various types of asbestos but

---

[1]Dr. Ensley cites Cornelius S. Hurlbut, Jr., Dana's Manual of Mineralogy, (16th Ed. 1952), p. 5, as follows:

Perhaps the most important and significant limitation placed by the mineralogist upon his definition of a mineral is that it must be a chemical *element* or *compound*. Even though considerable variation in composition within the framework of the formula is permissible, we must be able to express the composition of a mineral by a chemical formula. Thus all mechanical mixtures, even if quite uniform and homogeneous, are eliminated. This restriction on the definition of a mineral arises from the mineralogist's consistent picture of the structure of a crystalline solid as an indefinitely extended framework of atoms, ions, or groups of atoms arranged in regular geometric pattern. Such a solid must of necessity obey the laws of definite and multiple proportions and must be as a whole electrically neutral; hence it must have a composition expressible by a formula. There is no prohibition inherent in this restriction, however, on interchange of similar atoms of different kinds within the framework of the structure as long as the structure is kept intact and the condition of the electrical neutrality met. Hence, minerals may, and commonly do, vary widely in composition within a single mineral species by substitution of one kind of atom for another in the structure.

4

they always exist in definite proportion.[2]   He identified all of these types of asbestos as being both oxygen and metal compounds.  He also provided numerous references in authoritative literature where asbestos is classified as a compound.

Plaintiff introduced the affidavits of Barry Dellinger, Ph.D., and Rene A. DeHon, Ph.D.  In Dr. DeHon's opinion, for which he cites numerous sources, asbestos is a mineral, specifically a silicate,[3] one of the ten major groups of minerals. However, contrary to Dr. Ensley's opinion that all minerals are either elements or compounds and that asbestos is both an oxygen and a metal compound, Dr. DeHon disagreed, stating that he had never seen asbestos classified as either an oxygen compound or a metal compound in geological or mineralogical literature.  In his view, an oxygen compound referred only to a "simple oxygen compound" composed of a cation, i.e., a positively charged ion, and oxygen, substances such as water, H2O, that are significantly composed of oxygen.  Further, he stated that although asbestos contains the element oxygen, it exhibits none of the chemical properties of elemental or molecular oxygen.  For those same reasons, he did not believe that asbestos was a metal compound as it was not significantly composed of metal and does not exhibit the properties of metals.  Dr. Dellinger also disagreed with Dr. Ensley, stating that there was no universal chemical definition of a compound, but that in common usage it is "a substance containing two or more elements chemically bound in fixed proportions."  In his view, the fact that different forms of asbestos have variable compositions and can be expressed with many chemical formulas means they cannot

---

[2]Dr. Ensley stated that the chemistry of the asbestos forms in the amphibole group is more complicated than that of chrysotile.  Not only do the compounds have many more constituent atoms, but they also belong to mineral series which cover a variety of chemical compounds.  The mineral series are the result of substitution of one ion by another ion of similar size.  Numerous sources cited by him indicate that this variability in composition does not contradict the law of definite proportions.

[3]However, a "silicate" is generally defined as "any of numerous compounds containing silicon, oxygen, and one or more metals."  The American Heritage Medical Dictionary, (2007), Houghton Mifflin Company.

be compounds and are instead minerals. Dr. Dellinger explained that La. R.S. 23:1301.1(A)(1) "does not use terminology that has practical meaning or relevance in the field of chemistry." He further stated that a chemist would normally use the term metal or oxygen compound to refer to a substance that has a significant concentration of metal or oxygen or whose properties are governed by these elements. Finally, he stated that if compounds were defined in the manner set forth by Dr. Ensley, then the statute would include virtually all of the millions of possible chemical compounds and that in his view, "no reasonable person or even a poorly trained scientist would write a statute that they intended to be interpreted to include so many compounds."

Dr. Ensley took issue with Dr. Dellinger's statement that asbestos cannot be a compound because it has many chemical formulas, stating that asbestos is mined from the earth, the variations in analysis are due to impurities, some of which are part of the crystal structure and others are extraneous materials. In addition, there are several different types of asbestos which is why each type has a different chemical formula. Further, if as Dr. Dellinger argues, asbestos is a mineral, Dr. Ensley pointed out that it necessarily also must be a compound because it is undisputed that a mineral is always either an element or a compound, and it must necessarily contain atoms in specific ratio proportions because that is a key aspect of the definition of a mineral. Finally, the definition of a compound cited by Dr. Ensley states that a compound has characteristic properties quite different that those of its constituent elements.

Plaintiff also presented the testimony of several live witnesses. Dr. Richard Lemon, the former Deputy Director of the National Institute for Occupational Safety and Health, defined asbestos as a mineral fiber found in the earth's surface with various chemical formulations depending on where it is found and in what type of

mineralogical strata it is found.  Dr. Arnold Brody explained that "scientists define asbestos as a mineral, and the damaging aspect of asbestos is its nature as a fiber." Dr. Victor Roggli, described asbestos as a group of mineral fibers.

Neither of the lower courts analyzed the above testimony to determine whether asbestos was an oxygen or metal compound.  The court of appeal relied solely on its prior decision in **Terrance v. Dow Chemical Co.**, 06-2234 (La. App. 1 Cir. 9/14/07), 971 So. 2d 1058, *writ denied*, 07-2042 (La. 12/14/07), 970 So. 2d 534, which it declined to "revisit." **Rando v. Anco Insulations, Inc., et al.**, 07-2093 (La. App. 1 Cir. 5/2/08) (unpublished).  As stated in the majority opinion, the courts of appeal have split on this issue.  The Second and Fifth Circuits have held that all diseases resulting from an employee's contact with asbestos are occupational diseases covered by the 1952 Act.  In **Brunet v. Avondale Industries, Inc.**, 99-1354 (La. App. 5 Cir. 12/5/00), 772 So. 2d 974, *writ not considered*, 01-0171 (La. 3/23/01), 787 So. 2d 1006, the plaintiff contracted lung cancer resulting from contact with asbestos and a jury awarded him tort damages.  In its answer to plaintiff's appeal, Avondale urged that plaintiff was limited to workers' compensation because asbestos was both an oxygen and a metal compound.  The Fifth Circuit considered the affidavit of Dr. Ensley, essentially the same one offered in this case,  and found that the scientific evidence established that asbestos is an industrial term used to describe a group of six minerals, all of which consist of oxygen, silica and metal.  According to Dr. Ensley's affidavit, asbestos is not only a compound of oxygen and metal, but it is mostly oxygen and metal, whether measured by weight or number of atoms, and if either were removed, it would no longer be asbestos.  The court looked to the definition of compound offered by Dr. Ensley in this case, *see* p. 3, *supra*, and his statement that there is no distinction in chemistry between the terms "oxygen and its compounds,"

"oxygen-containing compounds," and "compounds that contain oxygen." The court

dismissed the opinion of another expert who testified that asbestos could not be an

oxygen compound because it did not display the reactivity typical to oxygen after

pointing out that the textbook definition of compound recognizes that the compounds

may not display the same chemical characteristics of their constituent elements. In

addressing the plaintiff's argument that the legislature could not have meant these

categories to be read so broadly because then "everything" would be included, the

court framed the issue as follows: "[t]he real question is not whether asbestos is an

oxygen compound from a chemical perspective, because clearly it is, but rather *did

the legislature intend* to include substances such as asbestos in categories such as

oxygen and metal compounds." *Id.* at 983. In answering the question in the

affirmative, the court stated:

> We consider persuasive the fact that asbestosis, an occupational disease
> caused by asbestos exposure, is included as a compensable occupational
> disease, as evidence that the legislature intended to include all
> occupational diseases caused by asbestos exposure. It is well settled that
> the provisions of the Workers' Compensation Law must be given a
> liberal interpretation in order to effectuate its beneficent purpose of
> relieving workmen of the economic burden of work-connected injuries
> by diffusing the cost in the channels of commerce. *Lester v. Southern
> Cas. Ins. Co.*, 466 So.2d 25 (La.1985). Given the focus of the workers'
> compensation scheme, which is to cover employees who are injured in
> the course and scope of their employment under the compensation
> scheme, it is not logical that the legislature intended to provide coverage
> for only some of the workers made sick from asbestos exposure, and not
> others. The legislature's action in specifically listing the disease
> asbestosis could be attributed to their limited knowledge of the disease
> processes caused by asbestos exposure (and their latency) at the time the
> statute was enacted (1958). Plaintiffs' interpretation of the workers'
> compensation statutes creates a scenario where side-by-side workers,
> exposed to the same disease causing agent (here, asbestos), will be
> covered differently depending on the specific disease they develop.
> Such a result is contrary to the spirit and purpose of the workers'
> compensation scheme. Plaintiff's cancer, if caused by asbestos exposure
> while in the course and scope of his employment, should be covered
> under workers' compensation the same as his asbestosis. This court
> finds that asbestos is a pathogen included in the list in R.S. 23:1031.1
> (1958), and therefore, plaintiff's exclusive remedy for an occupational

disease alleged to have been caused by asbestos is under the workers'
compensation scheme.

*Id.* at 983-84 (footnotes omitted).[4]

The Second Circuit has also determined that asbestos is both an oxygen and a
metal compound under the 1952 version of the Act. In *Adams v. Asbestos Corp.,
Ltd.*, 39,952 (La. App. 2 Cir. 10/28/05), 914 So. 2d 1177, the trial court granted the
defendant's motion for summary judgment on that issue based on the affidavits of
Drs. Ensley and DeHon. In considering DeHon's affidavit, the court of appeal
disagreed with DeHon's attempt to differentiate between an oxygen or metal
compound and a compound containing those elements, finding no difference in the
two for purposes of statutory construction. 914 So. 2d at 1182. The court also noted
that his explanation of the chemical composition of asbestos shows that it contains
oxygen and metal ions and that these are combined in fixed proportions to create
silicate minerals, a form of which is asbestos. *Id.* Thus, the court found that both

---

[4] I point out that during the effective life of this version of the statute (1952-1975), all
other Louisiana appellate courts determining whether a non-listed substance was covered under
the Act looked to see whether its constituent compounds were listed; if so, then the substance
was deemed to be covered. *See Bryant v. Magnolia Garment Co. Inc.*, 307 So. 2d 395, 397
(La. App. 2 Cir. 1975) ("An occupational disease claimant is not limited to recovery for diseases
designated in the statute by name and may recover for poisoning or other disease resulting from
contact with enumerated chemicals or compounds, even though the disease is not one of those
named"); *Zeringue v. Fireman's Fund Am. Ins. Co.*, 271 So. 2d 613 (La. App. 1 Cir. 1972)
(bullous emphysema not a listed disease, but the spray paint fumes that caused the disease
contained enough enumerated substances to make his illness compensable as an occupational
disease); *Bernard v. Louisiana Wildlife & Fisheries Comn.*, 152 So. 2d 114 (La. App. 3 Cir.),
*writ refused*, 153 So. 2d 881 (La. 1963) (chemical spray not listed by name but disease caused by
exposure to it still covered); *Riley v. Avondale Shipyards*, 305 So. 2d 742 (La. App. 4 Cir. 1974)
(detergent to which employee was exposed was not a listed substance, but "the detergent did
contain compounds of phosphorus, sulfur, and metals, included in R.S. 23:1031.1."); *Austin v.
Travelers Ins. Co.*, 79 So. 2d 383, 384 (La. App. 2 Cir. 1955) ("Plaintiff complains to be
suffering from the effect of TNT poisoning, which clearly brings him under the above quoted
wording of the statute, for according to uncontroverted testimony of one of the expert witnesses
in the case: 'TNT is the common name for 3, 4, 6-trinitrotoluene, an aromatic nitro compound,'
and this is included under La. R.S. 23:1301.1(A)(1)(i).) These decisions, from all four Louisiana
appellate courts then existing (the Fifth Circuit was not created until 1981), all date from the time
period when the 1952 version of the Act was in effect and all considered the chemical
composition of the disease-causing agent to determine if it was a compound of a listed substance.
Further, in these cases, the analysis centered around whether the substances merely contained
one of the listed substances or their compounds, not whether they were technically a
"compound." *Cf. Bernard, supra* (which apparently just assumed the chemical spray was a
covered substance with no analysis).

9

experts' opinions showed asbestos to be a compound of oxygen and of metal under statute. *Id.* Finally, the court relied on *Brunet* to find the intent of the legislature was to include all occupational diseases covered by asbestos. *Id.*[5]

However, in a long line of cases, the First Circuit has consistently held that because asbestosis was not a listed disease causing substance, and because lung cancer and mesothelioma are not listed diseases, that plaintiffs with those diseases have an action in tort. In the first of those cases, ***Thomas v. Armstrong World Industries, Inc.***, 95-2222 (La. App. 1 Cir. 6/28/96), 676 So. 2d 1185, *writ denied*, 96-1965 (La. 11/1/96), 681 So. 1272, the court of appeal overturned the trial court's grant of defendant's exception of no cause of action, wherein defendant argued that plaintiff contracted asbestosis which later led to lung cancer and that the inclusion of asbestosis in the statute leads to the logical conclusion that it was not necessary to include asbestos in the statute. The court of appeal ruled as follows:

> While Anco presents an interesting argument to support the inferential inclusion of asbestos in the provided list of substances within La. R.S. 23:1031.1, it is not sufficient to overcome the fact that asbestos is simply not specifically written as one of the exclusive substances; nor, is lung cancer provided as one of the diseases that falls under the restricted ambit of a workers' compensation action. The focal issue to be judicially determined is whether the lung cancer was independently caused by asbestos or, alternatively, whether it was a progression of the asbestosis disease that Mr. Thomas had simultaneously contracted. *See* ***Wallace v. Kaiser Aluminum & Chemical Corporation***, 586 So. 2d 149 (La. 1991). Defendant is not precluded from demonstrating at the trial level that the asbestosis initiated the lung cancer and, therefore, the lung cancer would be encompassed within the diseases limited to workers' compensation. However, this is not a legal conclusion that can be determined from the face of the pleadings alone.

676 So. 2d at 1187; *see also* ***Johnson v. Ashland Oil***, 96-0323 (La. App. 1 Cir. 12/20/96), 684 So. 2d 1156, *writ denied*, 97-206 (La. 3/14/97), 690 So. 2d 37

---

[5] In ***Graves v. Riverwood Intern. Corp.***, 41,810 (La. App. 2 Cir. 1/31/07), 949 So. 2d 576, *writ denied*, 07-630 (La. 5/4/07), 956 So. 2d 621, a case involving mesothelioma based on asbestos pre-dating the 1952 statute such that this issue was not determinative, the Second Circuit noted the split in the circuits regarding this issue and its prior holding in ***Adams***.

(following *Thomas, supra*, and holding that because asbestos was not a listed substance and mesothelioma was not a listed disease, defendant's motion for summary judgment claiming the Act provided the exclusive remedy should be denied). In *Terrance, supra*, the parties stipulated that asbestos is a compound of both oxygen and metal. The court noted the split in the circuits regarding whether mesothelioma fit within the statute's definition of occupational disease, but determined that it was bound and persuaded by the line of cases holding that it was not. In so doing, the court reasoned as follows:

> While asbestos does contain oxygen and metal, all compounds that contain oxygen and metal are not necessarily covered substances for purposes of former LSA-R.S. 23:1031.1. The broad interpretation proposed by Exxon would allow *any* disease resulting from contact with an compound containing oxygen or metal to be covered under the LWCA. We believe this inferential-inclusion interpretation goes far beyond the intentions of the legislature.

971 So. 2d at 1066; *see also Spillman v. Anco Insulations, Inc.*, 07-0763 (La. App. 1 Cir. 9/9/08), ___ So. 2d ___ (jurisprudence of First Circuit rejects broad interpretation that just because asbestos is a compound of oxygen and metal, that mesothelioma is a covered disease). The Fourth Circuit has likewise held that asbestos is not a substance covered by the pre-1975 amendment. In *Gautreaux v. Rheem Mfg. Co.*, 96-2193 (La. App. 4 Cir. 12/27/96), 694 So. 2d 977, 978, *writ denied*, 97-0222 (La. 3/14/97), 690 So. 2d 39, the court affirmed the trial court's denial of defendant's exception of no cause of action, finding that "[t]he record contains an extensive dispute over whether asbestos is better characterized as a 'mineral' or a 'compound' for the purposes of former La. R.S. 23:1031.1(A)1(d)" and therefore, "on this showing, it has not been established as a matter of law that asbestos must be considered an 'oxygen compound' within the context for [sic] former Subsection (d)." The court then noted that asbestos is a compound that

contains oxygen, but found that all compounds that contain oxygen may not necessarily be oxygen compounds for purposes of former Subsection (d). 694 So. 2d at 978; *see also* **Calloway v. Anco Insulation, Inc.**, 98-0397 (La. App. 4 Cir. 3/25/98), 714 So. 2d 730, *writ denied*, 98-1034 (La. 11/19/99), 749 So. 2d 666, and **Matrana v. Avondale Industries, Inc.**, 01-1505 (La. App. 4 Cir. 8/27/01), 803 So. 2d 59 (both following **Gautreaux**).[6]

---

[6]Judges Byrnes dissented in **Gautreaux**, with Judge Lobrano joining in his reasoning, arguing that the court should have taken judicial notice of the fact that asbestos is an oxygen compound:

> Although the fact that asbestos is an oxygen compound is not a fact generally known, neither is it an arcane scientific fact known only to expert chemists and nobel laureates. It is a fact easily grasped by anyone with a junior high general science course. It is easily and readily verifiable. Asbestos is defined in the Second College Edition of the American Heritage Dictionary (a reference book for the general public) as magnesium silicate, and a silicate is defined as "any numerous compounds containing . . . oxygen . . . ." (Emphasis added).

694 So. 2d at 982. In determining whether asbestos was one of the substances meant to be covered by the pre-1952 amendment, the dissenters noted the public policy that the Act must be broadly interpreted to provide coverage under the Act, and that because the statute did not include specific substances, but instead included a non-exclusive reference to oxygen compounds, the statute should be interpreted to include all oxygen containing compounds, reasoning as follows:

> [t]o read this list of substances in the narrow manner suggested by the majority would mean that only a fairly narrow and arbitrary list of work-related substances would be covered by the Workers' Compensation Act when logic leads to the conclusion that there is no reason why any one substance causing injury when encountered on the job would be treated differently from any other substance in a workers' compensation context. Had it been the intention of the Legislature to create an exclusive list of a few specifically perceived hazardous substances, it would have been only too easy to do so. . . .

> In the absence of specific restrictions from the Legislature, I can think of no public policy consideration that would favor providing workers' compensation for exposure to one substance as opposed to another, and I have no reason to believe that the Legislature intended to draw such distinctions. Because there is no logical basis for drawing such distinctions, the fact that the broad interpretation of the statute which I advocate would cover virtually any substance a worker is likely to encounter on the job is consistent with the liberal approach to statutory construction of workers' compensation provisions in general, and the most logical interpretation of this particular statute. Therefore, the majority's complaint that the viewing of asbestos as an oxygen compound would open the door to consideration of all substances, is not the weakness but the strength of my position. The focus of this court should be on the work related aspect of the substance rather than on a debate over exactly how many oxygen atoms are in asbestos.

*Id.* at 983-984. (Byrnes dissenting, joined by Lobrano).

Upon review of the language of the statute, the rules of statutory construction, the scientific evidence presented, the prior jurisprudence discussing this issue, and the history and policy of the Act, especially the policy that the Act is to be interpreted broadly in favor of coverage, the following is apparent. First is the language of the statute, which states that diseases caused by contact with "oxygen, nitrogen, carbon, and their compounds" or "metals other than lead and their compounds" are covered occupational diseases under the 1952 Act. The parties presented expert testimony and scientific evidence in support of their positions. A review of that evidence establishes that asbestos is a compound of both oxygen and metal in that each form of asbestos is a substance composed of atoms or ions of two or more elements, either oxygen or a metal, in definite proportion and represented by a chemical formula. Plaintiff's experts testified that asbestos is not a "compound" but rather a "mineral." However, the scientific textbooks and other data all defined a mineral as either an element or a compound formed as a result of geological processes. Therefore, if asbestos is in fact a mineral, then it is necessarily also a compound. The views of plaintiff's experts that oxygen or metal compounds are limited to those which are mostly oxygen or mostly metal was unsupported by any scientific evidence, and, other experts testified and presented evidence that all forms of asbestos were at least 50% oxygen by number of atoms and by weight they were more oxygen than anything else. Thus, given the evidence showing that asbestos is an oxygen and metal compound and considering the plain language of the statute, the statute is clear and unambiguous. There are simply no limiting or exclusionary words which would limit the coverage to only certain types of oxygen and metal compounds. Further, such an interpretation is consistent with the policy that the Act is to interpreted broadly in

13

favor of coverage.   For decades, the Act has been interpreted to provide workers' compensation coverage for employees in accordance with the policy to interpret the Act broadly.  Interpreted broadly, there can be no doubt that asbestos is both an oxygen and a metal compound.   In addition, this interpretation does not lead to absurd results, as it merely leads to coverage of illnesses and diseases resulting from contact with oxygen and metal compounds encountered in the workplace, no matter how many there are.   It would also result in all diseases caused by asbestos being covered under the 1952 Act, not just asbestosis.[7]  It is inconsistent to hold that different disease manifestations of the same work-related asbestos exposure should be treated differently under the Act.   The majority's interpretation leads to absurd consequences in that the statute would cover a less severe disease (asbestosis) caused by exposure to asbestos and not cover a co-worker suffering from a much more serious disease (mesothelioma) caused by exposure to the same asbestos. In addition, the proposition that inclusion of asbestos as an oxygen or metal compound would mean that a huge number of substances would be covered is unpersuasive, given that most of these substances either would never appear in the workplace or would not

---

[7]One commentator has also suggested that an aggravation of a covered disease that takes the form of a non-listed disease should be compensable under the Act:

> Apart from the provision that "no disease listed herein shall be construed to include tuberculosis within its scope," the provision is silent as to whether unlisted diseases which are caused or activated through the contraction of a listed disease shall be regarded as compensable.  When the initial injury is "accidental" our courts have consistently allowed compensation for all disease complications which are caused in fact by the accident and injury.  Similar reasoning would suggest that all aggravations of listed occupational diseases should be compensable, even if the aggravation takes the form of a non-listed disease.

Wex Malone, Louisiana Workmen's Compensation Law and Practice, § 218, p. 53 (1960 Pocket Part).  Application of this analysis would result in mesothelioma which started out as asbestosis, which is commonly the case, being covered under the Act. *See also Thomas v. Armstrong World Industries, supra,* holding that although asbestos was not a listed substance and lung cancer was not a listed disease, "[d]efendant is not precluded from demonstrating at the trial level that the asbestos initiated the lung cancer, and, therefore, the lung cancer would be encompassed within the diseases limited to workers' compensation."

cause a disease.

Finally, a review of the jurisprudence from the courts of appeal <u>that actually discussed and analyzed the issue</u> of whether asbestos is an oxygen or metal compound reveals that each of these courts either determined, or it was stipulated, that asbestos was in fact an oxygen compound, or a compound containing oxygen, with some finding that it was also a metal compound. This is true even among the courts that ultimately determined that lung cancer and mesothelioma were not covered diseases. For instance, in *Gautreaux*, the only Fourth Circuit case to actually discuss whether asbestos was an oxygen or metal compound, the court found that "[i]t is true that asbestos is a compound which contains oxygen . . . [h]owever, all compounds that contain oxygen may not necessarily be oxygen compounds for the purposes of former Subsection (d)." 694 So. 2d at 978. In *Terrance, supra,* the only First Circuit case to have discussed the issue, the parties stipulated that asbestos was a compound of both oxygen and metal, but the court nonetheless found that all compounds that contain oxygen and metal are not necessarily covered substances because this would allow any disease resulting from contact with any compound containing oxygen or metal to be covered under the Act. 971 So. 2d at 1064, 1066. As can be seen, while recognizing that asbestos was a compound of oxygen, those courts proceeded to read the statute very narrowly, finding that "compounds" did not mean all compounds, and/or that a compound containing oxygen was not the same as an oxygen compound. There is no reasonable scientific basis for such a distinction. Further, courts are bound to interpret the Act broadly in favor of coverage and are not allowed to stray from the unambiguous language of the statute in order to determine legislative intent. The broad and straightforward interpretation given the statute by the courts in *Brunet*

and *Adams* is much more in line with the intent of the statute and the policy underlying the Act.

The statutory language, the scientific evidence presented, and the history and policy behind the 1952 Act, especially that the Act must be interpreted broadly in favor of coverage, all establish that asbestos is an oxygen and/or metal compound for purposes of La. R.S. 23:1031.1. Accordingly, in my view, a person who contracts mesothelioma as a result of contact with asbestos in the course of his employment and as a result of the nature of the work performed is entitled to workers' compensation benefits as his exclusive remedy. Because the plaintiff in this case, Ray Rando, contracted mesothelioma as a result of contact with asbestos in the early 1970's, his exclusive remedy is in workers' compensation, not in tort.

For the foregoing reasons, I respectfully dissent.